**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| DATREC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2:21-cv-00106-JRG-RSP |
| | ) | |
| MEDITAB SOFTWARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT MEDITAB SOFTWARE, INC.'S
MOTION TO DISMISS WITH PREJUDICE UNDER FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND....................................................................................2

    A.  The Abstract Idea of Reference-Based Verifications ............................................ 2

        1.  Independent Claims 1 and 9........................................................................ 2

        2.  The Dependent Claims................................................................................ 6

    B.  DatRec's Deficient Allegations in the Complaint ................................................. 7

III.  STATEMENT OF THE ISSUES PRESENTED .................................................10

IV.  LEGAL STANDARDS .........................................................................................10

V.  THE COURT SHOULD DISMISS DATREC'S COMPLAINT WITH PREJUDICE BECAUSE THE ASSERTED PATENT IS DIRECTED TO A PATENT-INELIGIBLE ABSTRACT IDEA UNDER 35 U.S.C. § 101....................................................................12

    A.  Step One of *Alice*:  The Asserted Claims Are Directed to the Patent-Ineligible Abstract Idea of Reference-Based Verification.................................... 13

    B.  Step Two of *Alice*: The Asserted Claims Do Not Recite an Inventive Concept Beyond the Abstract Idea. .................................................................... 22

VI.  THE COURT SHOULD ALSO DISMISS DATREC'S COMPLAINT WITH PREJUDICE BECAUSE IT FAILS TO PLEAD A PLAUSIBLE CLAIM FOR INFRINGEMENT....................................................................................................24

VII.  THE COURT SHOULD AWARD ATTORNEYS' FEES TO MEDITAB .....................28

VIII.  CONCLUSION......................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)................................................................................11, 24

*Alice Corp. Pty. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ........................................................................................ *passim*

*Asghari-Kamrani v. United Servs. Auto. Ass'n*,
  No. 2:15-cv-478, 2016 WL 3670804 (E.D. Va. July 5, 2016)..........................................21, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................10, 24

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)......................................................................................11

*Blue Spike LLC v. Caterpillar Inc.*,
  No. 6:16-CV-1361, 2017 WL 2989204, at *6 (E.D. Tex. Apr. 1, 2017)....................26, 27, 29

*Boom! Payments, Inc. v. Stripe, Inc.*,
  839 F. App'x 528 (Fed. Cir. 2021) ................................................................................20

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018).....................................................................................20

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019)........................................................................................13

*ConocoPhillips Co. v. In-Depth Compressive Seismic Inc.*,
  No. 4:20-cv-04385, 2021 U.S. Dist. LEXIS 88469 (S.D. Tex. May 10, 2021)......................25

*Cook v. City of Tyler*,
  402 F. Supp. 3d 339 (E.D. Tex. 2019) ...........................................................................11

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
  558 F. App'x 988 (Fed. Cir. 2014) .................................................................................23

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014)......................................................................................23

*Edekka LLC v. 3balls.com, Inc.*,
    No. 2:15-CV-541 JRG, 2015 WL 9225038 (E.D. Tex. Dec. 17, 2015) .................................29

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)...........................................................................................17

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020)...........................................................................................20

*Fernandez—Montes v. Allied Pilots Ass'n*,
    987 F.2d 278 (5th Cir. 1993) .........................................................................................11, 27

*Finnavations LLC v. Payoneer, Inc.*,
    No. 1:18-CV-00444-RGA, 2019 WL 1236358 (D. Del. Mar. 18, 2019) ..............................29

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010)...........................................................................................25

*Funk v. Stryker Corp.*,
    631 F.3d 777 (5th Cir. 2011) .............................................................................................11

*Inhale, Inc v. Gravitron, LLC*,
    No. 1-18-cv-762-LY, 2018 WL 7324886 (W.D. Tex. Dec. 10, 2018) ..................................28

*Intell. Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017)...........................................................................................21

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015)...........................................................................................13

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
    876 F.3d 1372 (Fed. Cir. 2017)...........................................................................................29

*Kirsch Rsch. & Dev., LLC v. Atlas Roofing Corp.*,
    No. 5:20-cv-00055-RWS, 2020 WL 8363154 (E.D. Tex. Sept. 29, 2020)............................25

*LifeNet Health v. LifeCell Corp.*,
    837 F.3d 1316 (Fed. Cir. 2016)...........................................................................................25

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
    869 F.3d 1372 (Fed. Cir. 2017)...........................................................................................28

*In re Marco Guldenaar Holding B.V.*,
    911 F.3d 1157 (Fed. Cir. 2018)...........................................................................................18

*Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*,
    66 F.3d 285 (Fed. Cir. 1995)...............................................................................................12

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ........................................................................................................12

*My Health, Inc. v. ALR Techs., Inc.*,
    No. 2:16-cv-00535, 2017 WL 6512221 (E.D. Tex. Dec. 19, 2017) .........................29

*Opticurrent, LLC v. Power Integrations, Inc.*,
    No. 2:16-cv-325-JRG, 2016 WL 9275395 (E.D. Tex. Oct. 19, 2016) ...................25

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ....................................................................................11

*R+L Carriers, Inc. v. DriverTech LLC*,
    681 F.3d 1323 (Fed. Cir. 2012).................................................................................28

*Reese v. Sprint Nextel Corp.*,
    No. 2018-1971, 2019 WL 2418971 (Fed. Cir. June 10, 2019)................................18

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018).................................................................................11

*SB Holdings, LLC v. Vivint Smart Home, Inc.*,
    No. 4:20-cv-886, 2021 WL 1721715 (E.D. Tex. Apr. 30, 2021) ...........................12

*Semantic Search Techs. LLC v. Aldo U.S., Inc.*,
    425 F. Supp. 3d 758 (E.D. Tex. 2019)......................................................................10

*Shipping & Transit, LLC v. Hall Enterprises, Inc.*,
    No. CV 16-06535-AG-AFM, 2017 WL 3485782 (C.D. Cal. July 5, 2017)...........29

*Smart Authentication IP, LLC v. Elec. Arts, Inc.*,
    402 F. Supp. 3d 842 (N.D. Cal. 2019)......................................................................22

*Specialized Monitoring Sols., LLC v. ADT LLC*,
    367 F. Supp. 3d 575 (E.D. Tex. 2019)......................................................................22

*StrikeForce Techs., Inc. v. SecureAuth Corp.*,
    No. CV-1704314, 2017 WL 8808122 (C.D. Cal. Dec. 1, 2017), *aff'd*, 753 F.
    App'x 914 (Fed. Cir. 2019) ......................................................................................21

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016).................................................................................13

*Tenstreet, LLC v. DriverReach, LLC*,
    417 F. Supp. 3d 1144 (S.D. Ind. 2019).....................................................................19

*Tenstreet, LLC v. DriverReach, LLC*,
    826 F. App'x 925 (Fed. Cir. 2020) ...........................................................................19

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ............................................................................... 18

*In re TLI Commc'ns LLC Patent Litig.*,
    87 F. Supp. 3d 773 (E.D. Va. 2015), *aff'd*, 823 F.3d 607 (Fed. Cir. 2016) .......................... 23

*Universal Secure Registry LLC v. Apple Inc.*,
    469 F. Supp. 3d 231 (D. Del. 2020) ......................................................................... 22

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015) ......................................................................... 13, 18

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
    887 F.3d 1376 (Fed. Cir. 2018) ............................................................................. 20

## Statutes

35 U.S.C. § 101 ............................................................................................ *passim*

35 U.S.C. § 271(c) ................................................................................................ 9

35 U.S.C. § 285 .................................................................................................. 28

## Other Authorities

Fed. R. Civ. P. 8(a)(2) ......................................................................................... 10

Fed. R. Civ. P. 11 ............................................................................................... 28

Fed. R. Civ. P. 12(b)(6) .................................................................................... *passim*

## I.     INTRODUCTION

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Meditab Software, Inc. ("Meditab") respectfully moves the Court to dismiss with prejudice Plaintiff DatRec, LLC's ("DatRec") Complaint for failure to state a claim upon which relief can be granted.  Dismissal is warranted for at least two reasons.

*First*, DatRec's U.S. Patent No. 8,381,309 ("Asserted Patent") is directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Its claims are directed to the abstract idea of verifying the identity of an individual seeking access to a network by cross-referencing information from others regarding that individual.  Such reference-based verification is an age-old concept and business practice.  From private clubs to professional associations, exclusive networks have long interviewed references to verify an applicant's information and identity.  It is indeed a building block of society and a basic conceptual framework of business activities.  Nothing else in the claims facilitates an inventive concept.  The claims merely append this abstract idea to generic components (communication network, server, and database) and conventional methods (processing, compiling, and correlating user data).  These are exactly the types of claims held to be patent-ineligible by the Federal Circuit and district courts alike.  On this basis alone, the Court should grant dismissal with prejudice.

*Second*, the Complaint fails to plead a plausible claim for relief.  DatRec merely advances boilerplate allegations with conclusory statements and formulaic recitations of legal elements.  Its fleeting references to Meditab's website are entirely unrelated to the actual claim limitations at issue and provide no factual support from which an inference of infringement could be drawn.  The reason is simple.  Meditab does not practice the claim limitations of the Asserted Patent.  DatRec's apparent attempt to seek a quick payday based on an invalid patent and a facially deficient Complaint is objectively unreasonable.  Dismissal with prejudice is warranted.

## II.      FACTUAL BACKGROUND

### A.      The Abstract Idea of Reference-Based Verifications

The Asserted Patent (Ex. A) issued long before the Supreme Court's seminal *Alice* decision (2014). The Asserted Patent has 17 claims, with two independent claims. All but three claims are method claims. The other three are quasi system claims involving methods.

#### 1.      Independent Claims 1 and 9

The independent claims are both directed to the same concept of reference-based verification "for communication between users over a communication network." Ex. A at 19:10-34, 20:4-17. A brief comparison of the overlapping claim scope is presented below:

| **Claim 1** | **Claim 9** |
| --- | --- |
| Claim 1 recites the concept within the context of "[a] method for communication between users over a communication network." *Id.* at 19:11-12. | Claim 9 recites the concept within the context of "[a] system for enabling communication between users over a communication network." *Id.* at 20:4-5. |
| The claimed method includes "providing a database which comprises verified data relating to identity of an individual … being used for authenticating the identity of the individual." *Id.* at 19:13-17. | The claimed system includes "a database comprising verified data relating [to] an individual … to verify at least some of the data so as to authenticate an identity of the individual." *Id.* at 20:4-10. |
| The database is "accessible through the network." *Id.* at 19:14-15. | The database is "associated" with "a server system." *Id.* at 20:6. |

| Claim 1 | Claim 9 |
|---------|---------|
| "[P]ermitting a plurality of individuals related to the said individual to each enter data on the individual." *Id.* at 19:18-19. | The verification process involves "data on said individual entered by a plurality of related individuals." *Id.* at 20:12-13. |
| The identity of the individual is then verified "*by determining the level of reliability based on a degree of similarity between data on the individual entered by different individuals*." *Id.* at 19:26-29 (emphasis added). | The identity of the individual is then verified by "*determining a level of reliability in authenticity based on correspondence between data on said individual entered by a plurality of related individuals*." *Id.* at 20:11-13 (emphasis added). |
| This reference-based verification results in "defining one or more levels of permitted communication between individuals in the database and the verified individual on the basis of the verification." *Id.* at 19:31-34. | This reference-based verification results in "the system being configured to define one or more levels of permitted communication between individuals in the database and the verified individual on the basis of said verification." *Id.* at 20:14-17. |

The key limitation in these claims is the highlighted concept of verifying the identity of an individual by cross-referencing information entered by related individuals regarding that individual. This reference-based verification concept was added to the claims to overcome a rejection during prosecution before the United States Patent and Trademark Office ("USPTO"). Ex. B at 2-3. In connection with these amendments, applicants argued to the USPTO:

> The claimed subject matter utilizes a database including verified data relating to a plurality of individuals where **the verification authenticates the individual's identity,** and allows the authenticated individuals to at least partially define a communication level over the public communication network on the basis of said verification.
>
> Thus, according to the claimed subject matter, the verification provides for authenticating the identity of an individual that may be a party of electronic communication. To this end, the **authentication provides a level of reliability (or level of confidence) in the authenticity based on correspondence (match) between data on the individual entered by different users,** i.e. the degree of identity between data on a specific user entered by different users. **Based on the degree of confidence, one or more levels of permitted communication are defined.**

*Id.* at 9-10 (emphases in original). The Examiner subsequently allowed the application. Ex. C (Notice of Allowability, dated October 16, 2012). This allowance predated the Supreme Court's seminal *Alice* decision by nearly two years. Notably, the Examiner relied specifically on applicant's arguments regarding the reference-based verification concept. *Id.* at 6.

The claims recite no specialized structures, processors, or other components. Nor do they recite an improvement to technology. The specification of the Asserted Patent, in fact, acknowledges that the system involves "well-known methods, procedures, components and circuits." Ex. A at 6:18-20. The Asserted Patent further discloses that the "communication protocols" used in the claimed subject matter are "known to a person versed in the art." *Id.* at 8:14-23. Even the data models were "known in the art" (*id.* at 12:6-10), and "[t]he system of the present invention … is constructed and operative to match strings of data in many ways, similar in concept, for example based on the principles of hybridizing similar DNA sequences, *as is known in the art*" (*id.* at 12:36-40) (emphasis added); *see also id.* at 6:64-67 (noting that "references cited in the background teach many principles of computerized management of related data records that are applicable to the present invention"). Any data processing is also described as conventional. *Id.* at 6:21-33.

In other words, the claims merely recite—at a high level of generality—a conceptual framework for reference-based verification of individuals appended to conventional components, databases, and data processing methods.  Even the reference-based verification concept itself is disclosed in the context of conventional methods throughout the Asserted Patent.  The specification discloses, for instance, that the data may be obtained through online databases.  *Id.* at 9:54-55.  The data may, however, also be obtained through other conventional means such as "questionnaires and trivia quizzes."  *Id.* at 9:39-41.  This includes even ***conventional human activity of interviewing individuals***.  *Id.* at 9:55-60 ("[E]xperts may mine offline sources of information, such as National Registries and Church records.  Another way of obtaining information from an individual … is by interviewing him directly or by phone, for example.").

The Asserted Patent discloses that the "present invention aims at improving confidence in the identity of a party to an electronic communication."  *Id.* at 2:64-66.  This is, however, merely the result of conventional comparisons of data being entered, processed, compiled, and cross-referenced.  *Id.* at 6:21-33.  The Assert Patent itself demonstrates that there is nothing unconventional about data sets being compared as part of a verification process.  *Id.* at 6:64-67, 10:12-49; *see also id.* at Fig. 3A-C.

The independent claims differ in the sense that claim 1 recites types of data.  Specifically, claim 1 recites that the data entered by related individuals "is an individual-associated data bits (IDB) comprising a personal identifier and relationship data indicative of a family tree."  *Id.* at 19:20-22.  IDB is simply "a series of data pieces."  *Id.* at 5:14-15.  A "personal identifier" refers to conventional data entered regarding an individual, including the "name, address, birth date, etc."  *Id.* at 5:19-26.  And "relationship data" is data regarding the form of relationship between individuals—*e.g.*, kinship, friendship, and other associations.  *Id.* at 5:40-56.

The IDB is used to generate "an individual-associated data set (IDS)" that "comprises data on the individual and related individuals." *Id.* at 19:23-25.  An IDS is simply "a set of data pertaining to an identified individual." *Id.* at 5:57-58.  The "generating" step is disclosed as a conventional process performed by general-purpose computers. *Id.* at 6:21-33 ("[T]erms such as 'processing', 'computing', 'calculating', 'determining', 'deriving', 'generating' or the like, refer to the action and/or processes of a computer or computing system, or processor or similar electronic computing device, that manipulate and/or transform data represented as physical, such as electronic, quantities within the computing system's registers and/or memories into other data, similarly represented as physical quantities within the computing system's memories, registers or other such information storage, transmission or display devices.").  The IDSs of individuals are compiled "to construct the database." *Id.* at 19:30-31.  These are conventional data sets and processing methods.  The specification, in fact, discloses that these types of data sets, databases, and methods were known at the time of the filing date for the Asserted Patent. *Id.* at 3:59-62, 8:59-63.

### 2.    The Dependent Claims

The dependent claims add only conventional structures, functions, and steps.  Claims 2-8 and 11-17 all depend from the claimed method of independent claim 1.

Claims 2-4 are directed to providing an authenticated user with "a graded personalized receiving mechanism."  Ex. A at 19:35-37.  This "mechanism" is a basic application that permits an authenticated user to define and set different levels for communications and for the information revealed about the user. *Id.* at 19:38-45.  Claim 11 similarly recites enabling users to define different levels of permitted communications. *Id.* at 20:28-31.  The Asserted Patent neither discloses nor claims any particular structure or technological embodiment for these basic settings beyond the simple inputting and processing of user preferences. *Id.* at Fig. 4A.

Claim 5 recites "providing a user with a score for the reliability of the data." *Id.* at 19:46-48; *see also id.* at Fig. 5B.  The claimed score is an assigned number "based on the closeness of match" between the information entered by users.  *Id.* at 10:48-49.  This is based on processing, compiling, and comparing data sets.  *Id.* at 16:8-22; *see also id.* at Fig. 5B.  The Asserted Patent discloses these steps as conventional processing and manipulation of data.  *Id.* at 6:21-33.  The underlying models and algorithms are also described as well-known in the art.  *Id.* at 12:6-10.

Claims 11, 12, 16, and 17 are directed to providing an organizational chart based on the corresponding data for individuals in the database.  *Id.* at 20:20-35, 45-50.  The Asserted Patent discloses that the claimed organizational chart shows relatedness between users based on several basic parameters or factors.  *Id.* at 16:46-59.  The chart is effectively a family tree based on degrees of relatedness.

Claims 6 and 7 merely recite receiving data from different users.  *Id.* at 19:49-52.  And claim 8 merely recites a general-purpose system to carry out the method.  *Id.* at 20:1-3.  Claims 13-15 recites nothing more than a "control button" that allows users to prevent communications with other users.  *Id.* at 20:39-44.  Control buttons are basic features long known in the art.

Claim 10 is the only claim that depends from independent claim 9.  It recites at a high level of generality that the server system of independent claim 9 is configured for creating a database.  As previously discussed, the Asserted Patent discloses that the construction of the database is accomplished in accordance with principles already known in the art at the time of the filing date.  *Id.* at 8:59-63.

## B.    DatRec's Deficient Allegations in the Complaint

DatRec filed its Complaint against Meditab on March 24, 2021.  ECF No. 1 ("Compl.").  As an initial matter, the Complaint devotes only a single sentence to the subject matter of the Asserted Patent—vaguely alleging that "[t]he '309 patent relates to a novel and improved system

for secure communication over a public network." Compl. ¶ 7. Beyond this isolated sentence, DatRec makes no effort to provide any context regarding the claimed subject matter of the Asserted Patent—much less allege any purported technological improvement with respect to the claimed subject matter.

DatRec's sparse infringement allegations fare no better. The Complaint pleads no factual support from which any inference of purported infringement can be drawn. More specifically, DatRec's allegations against Meditab span only 9 short paragraphs of conclusory and unsubstantiated allegations to assert purported direct and indirect infringement of *one or more of 17 claims* of the Asserted Patent. *Id*. ¶¶ 6-15. DatRec's allegations are primarily based on a conclusory statement that "Meditab maintains, operates, and administers electronic health records through its website at www.Meditab.com, and other sources or websites, that infringe one or more claims of the '309 patent, including one or more of claims 1-17, literally or under the doctrine of equivalents." *Id.* ¶ 8.

The Complaint also includes a so-called "preliminary table" for one of the asserted claims as purported "[s]upport for allegations of infringement." *Id.* ¶ 9. DatRec's table relies on snapshots from general information regarding Meditab's software for electronic health records ("EHR"). *Id.* ¶ 10. Following each snapshot, DatRec simply recites the phrase "the reference describes" in combination with a *verbatim* copy of the claim language. *Id*.

DatRec's "preliminary table" does not plead how Meditab's EHR software purportedly meets each claim limitation. By way of only one example, claim 9 requires "a server system associated with a database … configured and operable to verify at least some of the data so as to authenticate an identity of the individual." *Id.* The snapshot from Meditab's website describes physician charting for medical histories of patients. It does not describe user verification

methods.  Nor does it describe the provisioning of a "server system."  The website link provided in DatRec's table instead simply explains that Meditab provides an "all-in-one multi-specialty EHR, Practice Management and Billing software solution [that] allows doctors to deliver the highest quality of care possible to their patients."  Ex. D at 2.

By way of another example, claim 9 further requires "determining a level of reliability in authenticity based on correspondence between data on said individual entered by a plurality of related individuals."  Compl. ¶ 10.   The snapshot from Meditab's website only describes software tools for clinicians "to make informed decisions at the point of care, manage regulatory compliance, and quickly identify process inefficiencies."  *Id.*  It describes neither reference-based verification of an individual by related individuals, nor determining a level of reliability in the authenticity of an individual.  *See* Ex. D.  While Meditab's EHR products also include online portals, accessing such portals employs industry standard authentication protocols. For Meditab's IMS ClientConnect portal, for instance, access can require a token or two-factor authentication based on industry standard protocols.  *See* Ex. E.   It does not involve the reference-based verification concept claimed in the Asserted Patent.

DatRec's indirect infringement allegations are even more terse.  For its induced infringement allegations, DatRec merely recites boilerplate legal elements for inducement. Compl. ¶ 13.  The Complaint fails to allege any factual support for this claim.  With respect to contributory infringement, the Complaint even fails to allege the required legal elements of 35 U.S.C. § 271(c).  *Id.* ¶ 14.  Finally, the Complaint seeks a finding of willful infringement. DatRec vaguely alleges that purportedly "Meditab has known of the '309 patent and the technology underlying it from at least the date of issuance of the patent."  *Id*. ¶ 13.  DatRec also fails to plead any factual support for this allegation.

### III.   STATEMENT OF THE ISSUES PRESENTED

Whether the Court should dismiss with prejudice DatRec's Complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) because:  (a) the Asserted Patent is directed to a patent-ineligible abstract idea under 35 U.S.C. § 101 and governing case law; and (b) DatRec has failed to plead a plausible claim for patent infringement under the Supreme Court's governing plausibility standard and governing case law regarding pleading direct, indirect, and willful infringement.

### IV.   LEGAL STANDARDS

A complaint must contain "a short and plain statement of the claim *showing that the pleader is entitled to relief.*" Fed. R. Civ. P. 8(a)(2) (emphasis added).  The Supreme Court thus has held that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief *that is plausible on its face.*'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added).  "A claim has facial plausibility when the pleaded factual content allows the court to *draw the reasonable inference that the defendant is liable* for the misconduct alleged." *Id*. at 663 (emphasis added).

This "facial plausibility" standard requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.*  A court must, therefore, dismiss a complaint when its factual allegations "have not nudged their claims across the line from conceivable to plausible."  *Id.* at 547; *see also Semantic Search Techs. LLC v. Aldo U.S., Inc.*, 425 F. Supp. 3d 758, 768 (E.D. Tex. 2019) ("Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint that does not state a claim for relief that is 'plausible on its face.'") (citations omitted).

"While a court must view the pleadings in a light favorable to the plaintiff, it should not strain to find inferences favorable to the plaintiff and should not accept conclusory allegations, unwarranted deductions, or legal conclusions." *Cook v. City of Tyler*, 402 F. Supp. 3d 339, 341 (E.D. Tex. 2019) (citations omitted).   In other words, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez—Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

"When reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).  The Fifth Circuit has repeatedly held that "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Id.* (citation omitted).

The issue of whether a patent is directed to patent-ineligible subject matter under 35 U.S.C. § 101 "is a question of law, based on underlying facts." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018).  "Like other legal questions based on underlying facts, *this question may be*, *and frequently has been*, *resolved* on a Rule 12(b)(6) … motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *Id.* (emphasis added); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) ("We have held that patent eligibility can be determined at the Rule 12(b)(6) stage."). *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (same).

**V.    THE COURT SHOULD DISMISS DATREC'S COMPLAINT WITH PREJUDICE BECAUSE THE ASSERTED PATENT IS DIRECTED TO A PATENT-INELIGIBLE ABSTRACT IDEA UNDER 35 U.S.C. § 101**

A Rule 12(b)(6) dismissal with prejudice is warranted here based on the four corners of the Asserted Patent.  There can be no factual dispute regarding the express claim language and disclosures of the Asserted Patent.  Nor can DatRec dispute the Asserted Patent's prosecution history.[1]  The indisputable record here demonstrates that the claims of the Asserted Patent are directed to a patent-ineligible abstract idea—the conceptual framework of reference-based verification of an individual's identity for access to a network.

This is not only an age-old concept of human behavior and conducting business, but also a fundamental building block of society at large.  Since the advent of associations, private clubs, banking, and even workplaces, such networks have verified the identify of individuals based on information provided by references.  That is exactly the method claimed by the Asserted Patent—with the sole exception that the claims append this abstract idea to a general-purpose communication network.

Even if a claimed invention qualifies as a "new and useful process, machine, manufacture, or composition of matter" (35 U.S.C. § 101), the Supreme Court "has long held that this provision contains an important implicit exception.  Laws of nature, natural phenomena, and *abstract ideas are not patentable*."  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (citing *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)) (emphasis added).

---

[1] Meditab respectfully requests that the Court take judicial notice of Exhibits B and C filed herewith, which are true and correct copies of public records from the prosecution history of the Asserted Patent before the USPTO.  "Courts routinely take judicial notice of patents, *prosecution history*, and patent applications."  *SB Holdings, LLC v. Vivint Smart Home, Inc.*, No. 4:20-cv-886, 2021 WL 1721715, at *1 (E.D. Tex. Apr. 30, 2021) (emphasis added); *see also Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 292 (Fed. Cir. 1995) ("[T]he prosecution history of the '241 patent is a matter of public record. Moreover, the meaning of the prosecution history is clear.").

"The 'abstract ideas' category embodies the longstanding rule that '[a]n idea of itself is not patentable.'" *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (citation omitted). The abstract idea exception applies where: (1) the claims at issue are directed to patent-ineligible concepts, *and* (2) do not contain additional elements sufficient to transform the abstract idea into a patent-eligible application.  *See Alice*, 134 S. Ct. at 2355.

Applying this two-step analysis, the claims—individually and as an ordered combination—merely recite the abstract idea of reference-based verification appended to conventional databases and communication networks.  The claims fall squarely within the Federal Circuit's description of an abstract idea—"a building block, a basic conceptual framework …." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1333–34 (Fed. Cir. 2015).  The Federal Circuit and numerous district courts have indeed routinely held similar claims to be directed to patent-ineligible subject matter under 35 U.S.C. § 101 and the Supreme Court's governing standard.  This Court should reach the same conclusion and dismiss DatRec's Complaint with prejudice.

## A. Step One of *Alice*:  The Asserted Claims Are Directed to the Patent-Ineligible Abstract Idea of Reference-Based Verification

Under the first step of the eligibility inquiry, courts must "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S. Ct. at 2355. "[T]he claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).  "[T]he specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019).  "The § 101 inquiry must [therefore] focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016).

The claims of the Asserted Patent are directed to the abstract idea of reference-based verification of an individual's identity for access to a network.  Starting with the plain claim language, independent claims 1 and 9 recite a method and a system for allowing individuals to communicate over a network after their identities have been verified through information provided by related individuals.  Ex. A at 19:11-34, 20:4-17.

In particular, claim 1 recites that a database with "verified data relating to [the] identity of an individual" is used "for authenticating the identity of the individual."  *Id.* at 19:13-17.  The "verified data" comes from "a plurality of individuals related to the said individual," each of whom "enter data on the individual."  *Id.* at 19:18-22.  A data set is generated that includes both data on the individual and the related individuals.  *Id.* at 19:23-25.  The individual's identifying data is then verified "by determining the level of reliability based on a degree of similarity between data on the individual entered by different individuals."  *Id.* at 19:26-29.  "[O]n the basis of this verification," the method defines "one or more levels of permitted communication between individuals in the database and the verified individual."  *Id.* at 19:30-34.

Claim 9 recites the same abstract reference-based verification method.  The "level of reliability in authenticity" of an individual's identity is "based on correspondence between data on said individual entered by a plurality of related individuals."  *Id.* at 20:11-13.  Claim 9 differs only insofar that this method is appended to a "server system."  *Id*. at 20:6-10.  According to the specification, the claimed server system is nothing more than a conventional server and general-purpose computers.  *Id.* at 7:63-8:10 (disclosing a "server system 210" with a "control computer terminal 212"); *see also id.* at Fig. 1 (showing the server system 210 with a computer 212 and a database 211); *see also id.* at 10:18-24 (disclosing that the "server system 210 and/or computer 260 connectable thereto are/is adapted to activate suitable software to organize data").

Viewed as a whole, the character of the claims is directed to the abstract idea of reference-based verification of an individual's identity for access to a network.  The claims simply require a conventional communication network and a database.  Users enter identifying information for themselves and regarding other users.  The information is processed, stored, and compared.  Communication between the users is permitted at "levels" based on a degree of "similarity" or "correspondence" between their entered information.

The claimed method and system are no different than the reference-based verification employed by a variety of networks for ages.  To join a private club or network, for instance, individuals are ordinarily required to provide identifying information along with a list of references.  The provided information and the character of the individual are verified through the references.  Network access and privileges may be based on the verification.  Some private networks assign different levels of membership.  Communication and exposure are naturally limited by the assigned levels.  Exclusive networks have operated in this fashion for centuries.

Other examples abound—spanning from professional associations to the workplace, fraternities, and even more modern systems such as social media platforms.  Simply put, privileges have been long granted based on the confidence in the individual's identity.  That is precisely the core of the claimed subject matter of the Asserted Patent.  The specification, in fact, expressly discloses that "[t]he present invention aims at *improving confidence in the identity* of a party to an electronic communication."  *Id.* at 1:64-66 (emphasis added).  The "level of confidence [is] based on the degree of identity between data on the user entered by different users."  *Id.* at 2:38-40.  The specification even expands the sources of information to "interviewing [individuals] directly or by phone."  *Id.* at 9:58-60.  That is no different than the age-old process of calling references to verify an individual's information.

The Asserted Patent simply seeks to append this conceptual framework of reference-based verification to a digital communication network.  The prosecution history of the Asserted Patent further confirms that reference-based verification is indeed the core concept of the claimed subject matter.  Applicant's argued the purported novelty of the issued claims over the prior art by focusing on this conceptual framework of reference-based verification:

> [A]ccording to the claimed subject matter, the verification provides for authenticating the identity of an individual that may be a party of electronic communication. To this end, the **authentication provides a level of reliability (or level of confidence) in the authenticity based on correspondence (match) between data on the individual entered by different users,** i.e. the degree of identity between data on a specific user entered by different users. **Based on the degree of confidence, one or more levels of permitted communication are defined.**

Ex. B at 10 (emphases in original).  The USPTO subsequently echoed this understanding in its Notice of Allowability.  Ex. C.  It summarized the claimed subject matter as "the process of verifying the identity of a subject.  A plurality of individuals related to the subject individual provides identity data about the subject.  The identity of the subject is verified by determining its authenticity based on a degree of similarity between the data provided by the related individuals."  Ex. C at 6.

On this record, there can be no reasonable dispute that the abstract idea of the reference-based verification method forms the core of the claimed subject matter.  Simply appending this concept to a conventional communication network, server system, and database does not transform the abstract idea to patent-eligible subject matter.  *See Alice*, 134 S. Ct. at 2358 ("These cases demonstrate that the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. … Stating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result.").

The claims recite no specialized structures, processors, or other components to carry out the abstract idea.  It is simply appended at a high level of generality to conventional data processing, compiling, and correlating techniques as well as components.  The Asserted Patent, in fact, discloses that each of the means and techniques for carrying out the method are "well-known methods, procedures, components and circuits."  Ex. A at 6:18-20.

Starting with the claimed communication network, the specification discloses it as conventional and well-known.  *Id.* at 1:28-43, 7:59-8:2; *see also id.* Fig. 1 (illustrating communication network).  The related "communication protocols" are also disclosed as commonly "known to a person versed in the art."  *Id.* at 8:14-23.  The claimed "server system" is similarly disclosed as a conventional server and general-purpose computers.  *Id.* at 7:63-8:10 (disclosing a generic "server system 210" with a "control computer terminal 212").  It is effectively nothing more than a "server system 210 and/or computer 260" that is connectable to the network and "*adapted to activate suitable software to organize data.*"  *Id.* at 10:18-24 (emphasis added).  There is nothing specialized about the server system.  Nor does it represent a technological improvement.

The database at the center of the method is similarly not specialized or a technological improvement over databases in the prior art.  The specification discloses that the data entered by users is "processed to construct the database."  *Id.* at 2:30-31.  There is nothing unconventional about such a database, which was known prior to the Asserted Patent.  *Id.* at 3:59-4:1.  The claimed database does not "improve the way a computer stores and retrieves data in memory"—in contrast to the self-referential database in the Federal Circuit's *Enfish* decision.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016).  The Asserted Patent even discloses that the underlying models and algorithms are well-known in the art.  Ex. A at 12:6-10.

Put differently, all the components and processes claimed in the Asserted Patent simply "refer to the action and/or processes of a computer or computing system … that manipulate and/or transform data represented as physical, such as electronic, quantities within the computing system's registers and/or memories …." *Id.* at 6:22-33.  The claims thus recite nothing more than a method carried out by conventional, well-known means.  The claimed method is, however, directed to "a building block, a basic conceptual framework." *Versata*, 793 F.3d at 1333–34.  Without more, the claimed method is merely directed to an abstract idea that cannot be salvaged with physical components. *See*, *e.g.*, *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea."); *Reese v. Sprint Nextel Corp.*, No. 2018-1971, 2019 WL 2418971, at *3 (Fed. Cir. June 10, 2019) (rejecting argument that abstract claims were patentable simply because "the claims require specific telephone features").  The Supreme Court has expressly held that using a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. *See Alice*, 134 S. Ct. at 2347.

So too here, simply reciting generic physical structures cannot confer patent eligibility. *See*, *e.g.*, *In re Marco Guldenaar Holding B.V.*, 911 F.3d 1157, 1161 (Fed. Cir. 2018) (rejecting argument that "claimed method of playing a dice game cannot be an abstract idea because it recites a physical game with physical steps . . . because the abstract idea exception does not turn solely on whether the claimed invention comprises physical versus mental steps.").  Nor can physical structures in communication networks rescue the claims.  Indeed, "[t]he claimed methods in *Bilski* and *Alice* also recited actions that occurred in the physical world." *Id.*  That is particularly the case where, as here, the physical structures are conventional.

The only thing left is an abstract idea of reference-based verification of an individual's identity for access to a network.  Claims directed to similar concepts have been held patent-ineligible under 35 U.S.C. § 101 by the Federal Circuit and district courts alike.  In *Tenstreet*, for instance, the Federal Circuit recently affirmed a motion to dismiss that claims directed to "a method for using a peer-to-peer network to verify the employment history of job applicants" were invalid for claiming an abstract idea.  *Tenstreet, LLC v. DriverReach, LLC*, 826 F. App'x 925, 926 (Fed. Cir. 2020).  Akin to DatRec's Asserted Patent, the claims in *Tenstreet* recited a communication network with data transmissions that were compiled in a database for purposes of a verification process.  The district court held that the "patent is a 'quintessential do it on a computer patent.'"  *Tenstreet, LLC v. DriverReach, LLC*, 417 F. Supp. 3d 1144, 1149 (S.D. Ind. 2019).  The Federal Circuit agreed and held that the "claims are directed to the abstract idea of collecting, organizing, and storing data on a conventional computer network …."  *Tenstreet*, 826 F. App'x at 926.  The claimed subject matter's purported advantages over the prior art could not salvage the claims.  *Id.* ("The test for patent-eligible subject matter is not whether the claims are advantageous over the previous method.").

DatRec's Asserted Patent is similarly the "quintessential do it on a computer patent." The specification, in fact, highlights that ***the concept can be carried out manually***.  "[E]xperts may mine offline sources of information" to obtain the verification data.  Ex. A at 9:55-57.  Such offline sources include, for instance, "national registries, church, mosque and synagogue records, family trees, community records, schools and higher education records, professional association records, industrial company records and newspaper records."  *Id.* at 10:4-11.  As previously discussed, the Asserted Patent even envisions the use of ***fundamental human activities such as interviewing individuals***.  *Id.* at 9:55-60.  Courts have routinely found patent-ineligibility for

such claims that merely transpose an abstract idea performed by humans for ages to computers. *See*, *e.g.*, *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385 (Fed. Cir. 2018) ("First, the claims as a whole are drawn to the concept of voting, verifying the vote, and submitting the vote for tabulation. Humans have performed this fundamental activity that forms the basis of our democracy for hundreds of years. … These steps are therefore nothing more than abstract ideas.").

Any attempt by DatRec to rely on the notion that the reference-based verification controls access and communication over a network is also unavailing.  In *Ericsson*, for instance, the Federal Circuit rejected a system for controlling access to a platform in a wireless telecommunications system.  *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020).  While the claims there did not involve a reference-based verification for individuals, they are analogous to DatRec's claimed abstract idea in the sense that both sets of claims control access to a network based on an authentication process.  The Court held that the core of the claims was directed to a "bare abstract idea" of "controlling access to resources by receiving a request and determining if the request for access should be granted."  *Id.*

The same is true with respect to DatRec's claims—albeit DatRec's Asserted Patent involves an even more abstract, age-old idea of mediating access to a network based on references provided by others.  *See also Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 529 (Fed. Cir. 2021) (affirming dismissal because claims reciting a method of authenticating transactions based on data provided by a third-party intermediary were invalid under § 101).  The creation of a database similarly cannot salvage the claims of the Asserted Patent.  *See*, *e.g.*, *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018) (affirming summary judgment that claims directed to a method of processing and indexing data in a database were

20

invalid under § 101); *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (affirming dismissal with respect to claims reciting a method of creating a database and processing information).

Several district court decisions regarding claims directed to user authentication methods are also analogous.   In *Asghari*, for instance, the district court dismissed with prejudice on grounds of subject matter ineligibility.  *Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15-cv-478, 2016 WL 3670804, at *1 (E.D. Va. July 5, 2016).  The claimed system was directed to "a Central-Entity for centralized identification and authentication of users and their transactions to increase security in e-commerce."  *Id*.   The district court held that "the use of a third party intermediary to confirm the identity of a participant to a transaction and the use of a temporary code to confirm the identity of a participant to a transaction" was a combination of two abstract ideas.  *Id*. at *11.  The same is true here.  DatRec's claimed subject matter is directed to a centralized system (a server system) that carries out a reference-based verification to purportedly provide a higher level of security in communications over a network.  Just as in *Asghari*, the claims here recite no technological improvement or specialized structures.

In *Strikeforce*, the district court similarly dismissed with prejudice and the Federal Circuit affirmed.  *StrikeForce Techs., Inc. v. SecureAuth Corp.*, No. CV-1704314, 2017 WL 8808122, at *6 (C.D. Cal. Dec. 1, 2017), *aff'd*, 753 F. App'x 914 (Fed. Cir. 2019).  The claims were directed to multichannel security systems and methods for authenticating a user seeking to gain access to a secure network.  The district court held that the claims are directed to the abstract idea of restricting access to a network based on user authentication protocols.  *Id.*  The claims involved "a long-established means of transmitting sensitive information" through familiar processes of "existing in-band and out-of-band authentication systems."  *Id.*  DatRec's claimed subject matter

is similarly directed to an authentication process that determines restrictions (levels for communication) on a network, and uses age-old processes of reference-based verification.

There are also many other analogous decisions. *See*, *e.g.*, *Universal Secure Registry LLC v. Apple Inc.*, 469 F. Supp. 3d 231, 240 (D. Del. 2020) (dismissing and holding that claims for collecting, processing, and examining data to authenticate user identity based on biometric information was directed to a patent-ineligible abstract idea); *Smart Authentication IP, LLC v. Elec. Arts, Inc.*, 402 F. Supp. 3d 842, 855 (N.D. Cal. 2019) (dismissing and holding that claims for using multiple communications media to reliably authenticate remote users was directed to a patent-ineligible abstract idea). The case law demonstrates that claims reciting user authentication or verification by way of conventional data processing means and components are directed to patent-ineligible subject matter. *See also Specialized Monitoring Sols., LLC v. ADT LLC*, 367 F. Supp. 3d 575, 595 (E.D. Tex. 2019). Meditab respectfully submits that the claims of the Asserted Patent are not materially different in this respect. The Asserted Patent merely recites conventional data processing methods and components appended to an abstract idea. Patentability should not be conferred to such abstract ideas. *See Alice*, 134 S. Ct. at 2355.

### B. Step Two of *Alice*: The Asserted Claims Do Not Recite an Inventive Concept Beyond the Abstract Idea.

Under the second step of the eligibility inquiry, courts must further "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (citations omitted). The Supreme Court has described this "as a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.*

Nothing in DatRec's claims, either individually or as an ordered combination, adds significantly more than the abstract idea of reference-based verification.  The claims recite no specialized structures, processors, or other components.  Ex. A at 6:22-33.  Nor do they recite a technological improvement.  The communication network and protocols are conventional.  *Id.* at 1:28-43, 7:59-8:2, 8:14-23.  The claimed "server system" is also a general-purpose server or computer.  *Id.* at 7:63-8:10, 10:18-24.  The central database is similarly just an ordinary database.  *Id.* at 2:30-31, 3:59-4:1.  And the underlying models and algorithms are well-known in the art.  *Id.* at 12:6-10.

Such conventional components, models, and methods that "merely perform[] generic, ordinary functions … do not form the basis for an inventive concept[.]"  *In re TLI Commc'ns LLC Patent Litig.*, 87 F. Supp. 3d 773, 792 (E.D. Va. 2015), *aff'd*, 823 F.3d 607 (Fed. Cir. 2016).  Put differently, the "disclosure of structure and concrete components is insufficient when those disclosures are generic and do not operate as meaningful limitations on the boundaries of the patent."  *Id.*; *see also Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1349-51 (Fed. Cir. 2014).

The dependent claims of the Asserted Patent merely add more conventional building blocks to controlling the level of access available based on the abstract verification method.  Claims 2-4 and 11, for instance, merely provide a setting by which an authenticated user can define different levels of disclosure and communication.  *Supra* § II(A)(2).  Private networks have long permitted members to select different levels of access such that only individuals with the same level can see each other's information and communicate.  For instance, only members with the same clearance and badge can access an area and communicate.  At most, this is a

second abstract idea.  *See Asghari*, 2016 WL 3670804, at \*11.  An abstract idea cannot form the basis of an inventive concept.  *See Aatrix*, 890 F.3d at 1359.  The inventive concept must be something different and beyond an abstract idea.  *See Alice*, 134 S. Ct. at 2355

Other dependent claims merely add conventional methods of providing a reliability score, an organizational chart based on relatedness of individuals—akin to a family tree, a control button, and a database.  The Asserted Patent expressly recognizes that these are basic features well-known in the art.  *Supra* § II(A)(2).  These generic elements do not add an inventive concept.  "[A]ppending conventional steps, specified at a high level of generality, to a method already well known in the art is *not enough* to supply the 'inventive concept' needed to make this transformation."  *Alice*, 134 S. Ct. at 2350 (internal quotation marks and citations omitted).

For at least the foregoing reasons, Meditab respectfully submits that the Asserted Patent is directed to a patent-ineligible abstract idea.  The claim language, specification, and prosecution history of the Asserted Patent cannot be reasonably disputed.  And DatRec cannot cure the patent-ineligibility of its claims through amendment of the Complaint.  Accordingly, Meditab respectfully submits that dismissal with prejudice under Rule 12(b)(6) is warranted and should be entered.

## VI.   THE COURT SHOULD ALSO DISMISS DATREC'S COMPLAINT WITH PREJUDICE BECAUSE IT FAILS TO PLEAD A PLAUSIBLE CLAIM FOR INFRINGEMENT

DatRec's infringement action lacks any merit and pleads no factual support from which an inference of infringement could be drawn.  Even accepting all allegations as true and drawing all reasonable inferences in DatRec's favor, the Complaint fails to plead a claim for patent infringement under the Supreme Court's governing plausibility standard.  DatRec rather resorts to pleading the types of labels, conclusions, and formulaic recitations of legal elements that have been repeatedly rejected by the courts.  *Twombly*, 550 U.S. at 555.

24

Spanning only a few short paragraphs, DatRec vaguely alleges infringement of one or more of the 17 claims of the Asserted Patent.  Compl. ¶¶ 6-15.  As an initial matter, all but two of the claims are directed to methods.  "To allege infringement of a method claim, the plaintiff must plead facts that show that all steps of the claimed method were performed by the defendant."  *ConocoPhillips Co. v. In-Depth Compressive Seismic Inc.*, No. 4:20-cv-04385, 2021 U.S. Dist. LEXIS 88469, at *5 (S.D. Tex. May 10, 2021) (citation omitted).

DatRec has not attempted to plead a single instance of direct infringement for any of the method claims in the Asserted Patent.  *See*, *e.g.*, *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) ("[I]t is not enough to simply show that a product is capable of infringement; *the patent owner must show evidence of specific instances of direct infringement*.").  Nor has it pleaded that "all steps of the claimed method [are] performed by or attributable to a single entity" within the United States. *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1325 (Fed. Cir. 2016).  Meditab, therefore, respectfully submits that the Complaint fails to plausibly allege infringement with respect to 15 of the 17 claims in the Asserted Patent.

DatRec's allegations of infringement with respect to independent claim 9 fare no better. To sufficiently plead a claim for direct infringement, "a plaintiff must *explicitly plead facts to plausibly support* the assertion that a defendant 'without authority makes, uses, offers to sell, or sells any patented invention during the term of the patent.'"  *Opticurrent, LLC v. Power Integrations, Inc.*, No. 2:16-cv-325-JRG, 2016 WL 9275395, at *3 (E.D. Tex. Oct. 19, 2016) (emphasis added).  "To survive a motion to dismiss, therefore, a plaintiff must allege facts sufficient to create a plausible inference that *each element of the claim is infringed by the accused products*."  *Kirsch Rsch. & Dev., LLC v. Atlas Roofing Corp.*, No. 5:20-cv-00055-RWS, 2020 WL 8363154, at *2 (E.D. Tex. Sept. 29, 2020) (emphasis added).

DatRec has not met and cannot meet this burden.   While the Complaint includes a purported "preliminary table" for claim 9, this table falls far short of the "facial plausibility" standard.   It includes four images selected from Meditab's website.   Compl. ¶ 10.   For each image, DatRec simply recites the phrase "the reference describes" in combination with a *verbatim* copy of the claim language.   *Id.*   The table provides no connection between the images and DatRec's conclusion that somehow Meditab practices the claim limitations at issue.

DatRec's allegations are exactly the kind of conclusory and formulaic recitations that cannot be afforded any weight and must be rejected.   *See*, *e.g.*, *Blue Spike LLC v. Caterpillar Inc.*, No. 6:16-CV-1361 RWS-JDL, 2017 WL 2989204, at *6 (E.D. Tex. Apr. 1, 2017), report and recommendation adopted, No. 6:16-cv-1361 RWS-JDL, 2017 WL 1829858 (E.D. Tex. May 8, 2017) (dismissal with prejudice) ("Though a court must accept as true well-pleaded facts, 'naked assertions devoid of further factual enhancements, 'formulaic recitations of the elements of a cause of action,' and 'conclusory allegations' are not facts which are sufficient to survive a 12(b)(6) motion to dismiss.).

Moreover, the images reproduced in DatRec's table do not even remotely relate to the claim limitations at issue.   Claim 9 requires "a server system associated with a database … configured and operable to verify at least some of the data so as to authenticate an identity of the individual."   Compl. ¶ 10.   The image from Meditab's website merely describes physician charting for medical histories of patients.   *Id.*

Claim 9 also requires "determining a level of reliability in authenticity based on correspondence between data on said individual entered by a plurality of related individuals."   *Id.* Meditab's website only describes software tools for clinicians "to make informed decisions at the point of care, manage regulatory compliance, and quickly identify process inefficiencies."   *Id.*

26

It describes neither reference-based verification of an individual by related individuals, nor determining a level of reliability in the authenticity of an individual.  DatRec cannot simply present these images with naked assertions and deduce without any factual support that Meditab infringes claim 9.  *See Blue Spike*, 2017 WL 2989204, at *6 (granting dismissal with prejudice); *see also Fernandez*, 987 F.2d at 284 ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").

DatRec has failed to allege factual support for good reason.  There is simply no factual support for the notion that Meditab purportedly practices each limitation of claim 9.  First, the claim requires a "server system."  Meditab provides EHR software.  Ex. D.  It does not provision a server system to users.  Second, Meditab's EHR software does not verify the identity of an individual based on data entered by "related individuals."  Access to the system is based on industry standard authentication protocols. *Supra* § II(B).  Third, Meditab's EHR software does not assign levels of permitted communication between users.  DatRec simply cannot allege factual support—much less show—direct infringement by Meditab.

DatRec's allegations of indirect infringement also fail.  The full extent of DatRec's allegation of indirect infringement is reproduced below:

> Meditab has and continues to [induce infringement / contributorily infringe]. Meditab has actively encouraged or instructed others (e.g., its customers and/or the customers of its related companies), and continues to do so, on how to use its products and services (e.g., question and answer services on the Internet] and related services that provide question and answer services across the Internet such as to cause infringement of one or more of claims 1–17 of the '309 patent, literally or under the doctrine of equivalents. Moreover, Meditab has known of the '309 patent and the technology underlying it from at least the date of issuance of the patent.

Compl. ¶¶ 13, 14 (both paragraphs use the same language).

For an allegation of induced infringement to survive a motion to dismiss, a complaint must plead facts plausibly showing that the accused infringer 'specifically intended [another

party] to infringe [the patent] and knew that the [other party]'s acts constituted infringement.'" *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017).  Apart from failing to sufficiently allege a single instance of underlying direct infringement, the Complaint also fails to allege any factual support for any purported intent to have another party infringe the Asserted Patent and any knowledge of such purported infringement.  *See*, *e.g.*, *Inhale, Inc v. Gravitron, LLC*, No. 1-18-cv-762-LY, 2018 WL 7324886, at *3 (W.D. Tex. Dec. 10, 2018) (dismissing complaint because the "induced infringement claim entirely lacks factual allegations … that Gravitron intended another party to infringe and knew of that party's infringement").

For its contributory infringement allegation, DatRec even fails to plead the necessary legal elements—that Meditab "sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent.'" *R+L Carriers, Inc. v. DriverTech LLC*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (quoting 35 U.S.C. § 271(c)).

The Complaint further seeks a finding of willful infringement in the prayer for relief. DatRec also fails to plead any factual support for this allegation.  *See Inhale*, 2018 WL 7324886, at *3 (dismissing willful infringement because the complaint "lacks factual allegations raising a reasonable inference of pre-suit knowledge").  Meditab respectfully submits that DatRec's Complaint fails to plead a plausible claim of infringement, and that any amendment would be futile to rectify the significant deficiencies in DatRec's allegations.

## VII.   THE COURT SHOULD AWARD ATTORNEYS' FEES TO MEDITAB

Pursuant to Fed. R. Civ. P. 11 and 35 U.S.C. § 285, Meditab respectfully submits that, assuming it prevails on this motion, an award of its attorneys' fees is warranted in this case. DatRec's Complaint is either frivolous or objectively unreasonable.

Courts have granted attorneys' fees under similar circumstances where a plaintiff brought suit on a patent that was obviously invalid under the *Alice* framework.  *See*, *e.g.*, *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1377–80 (Fed. Cir. 2017) ("The district court did not abuse its discretion in awarding fees based on IH's failure to reassess the weakness of its case under *Alice* and then confining the award to fees accrued after the *Alice* decision issued."); *My Health, Inc. v. ALR Techs., Inc.*, No. 2:16-cv-00535, 2017 WL 6512221, at *4 (E.D. Tex. Dec. 19, 2017) ("The weakness in My Health's § 101 position is by itself a sufficient basis for finding the cases exceptional."); *Edekka LLC v. 3balls.com, Inc.*, No. 2:15-CV-541 JRG, 2015 WL 9225038, at *4 (E.D. Tex. Dec. 17, 2015); *Shipping & Transit, LLC v. Hall Enterprises, Inc.*, No. CV 16-06535-AG-AFM, 2017 WL 3485782, at *7 (C.D. Cal. July 5, 2017) ("In sum, Plaintiff's § 101 position was objectively unreasonable in light of the Supreme Court's *Alice* decision and the cases that applied that decision to invalidate comparable claims."); *Finnavations LLC v. Payoneer, Inc.*, No. 1:18-CV-00444-RGA, 2019 WL 1236358, at *2 (D. Del. Mar. 18, 2019).

Courts have also awarded attorneys' fees where the Complaint was facially deficient because it failed to allege factual support from which a reasonable inference of infringement could be drawn.  *See*, *e.g.*, *Blue Spike*, 2017 WL 2989204, at *6 ("The Court finds that in this case, sufficient cause may exist to impose sanctions against Blue Spike for filing a frivolous lawsuit against Caterpillar, *unsupported by any evidence*, which demonstrates a lack of care in making basic and proper inquiries …").  Meditab respectfully submits that such is the case here.

# VIII.   CONCLUSION

For the foregoing reasons, Meditab respectfully requests that the Court grant this Motion in its entirety and award any additional relief that the Court deems just and proper.

Respectfully submitted,

Dated:  May 17, 2021                    */s/ Brian Paul Gearing*

---

Brian Paul Gearing (*pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022-2524
Tel: (212) 223-4000
Fax: (212) 223-4134
bgearing@crowell.com

Ali H.K. Tehrani (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel: (202) 654-2500
Fax: (202) 628-5116
atehrani@crowell.com

Michael E. Jones
SBN:  10929400
POTTER MINTON, PC
110 North College, Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

*Attorneys for Defendant Meditab Software, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I served the foregoing document upon the attorneys of record for all parties by electronically filing the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to registered attorneys of record.

Dated:  May 17, 2021                                           */s/ Brian Paul Gearing*

                                                                          Brian Paul Gearing